UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

* * * * * * * * * * * * * * * * * * *

Dennis A. Beveridge,

Plaintiff,

vs. ORDER

Northwest Airlines, Inc.,

Defendant. Civ. No. 01-1416(RLE)

* * * * * * * * * * * * * * * * * * *

At Duluth, in the District of Minnesota, this 10th day of March, 2003.

## I. Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to the consent of the parties, as authorized by Title 18 U.S.C. §636(c), upon the parties' cross-Motions for Summary Judgment, and upon the Defendant's Motion to Strike the Plaintiff's Reply Papers.

At a Hearing on the Motions, the Plaintiff appeared by Kyle H. Torvinen, Esq., and the Defendant appeared by Tracy J. Van Steenburgh, Esq.

For reasons which follow, we grant the Defendant's Motion for Summary Judgment, and deny the Plaintiff's cross-Motion, and further, we deny the Defendant's Motion to Strike.

FILED MAR 10 2003
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD 3/10/03
DEPUTY CLERK

(63)

## II. Factual and Procedural History

The Plaintiff claims that the Defendant, which is his employer, discriminated against him in violation of the Minnesota Human Rights Act ("MHRA"), Minnesota Statutes Section 363.01 et seq., and the Americans With Disabilities Act ("ADA"), Title 42 U.S.C. §12101 et seq. In his Complaint, the Plaintiff seeks a Declaratory Judgment, that his rights have been violated, an Order permanently enjoining the Defendant from engaging in practices which assertedly violate the MHRA and the ADA, and an award of back pay, and other damages, and fines, attorney fees, and costs. Both parties have moved for Summary Judgment, each asserting that Judgment is warranted in their respective favors, as a matter of law. In addition, the Defendant has moved to strike the Plaintiff's responsive papers.

The Plaintiff started his employment with the Defendant, in September of 1968, and he has been employed at the International Airport, in Duluth, Minnesota, since July of 1995. Throughout his employment with the Defendant, the Plaintiff has held the same position -- that of Customer Service Agent ("CSA").[1] The CSA position requires work in four distinct areas. The first is at a Ticket Counter, where a CSA's duties involve continual customer con-

---

[1]Prior to 1986, the CSA position was entitled "Station Agent."

tact, computer use, the transfer of customer baggage -- which could weigh up to seventy pounds, and which averages fifty pounds in weight -- long term standing, and walking short distances. See, Exhibit 2 attached to Affidavit of Lisa M. Todd ("Jandrt Affidavit").[2]

CSAs also work at the Gate, where their duties include assisting in the boarding process, arranging seat assignments, opening and closing aircraft doors -- which requires the ability to push and/or pull between forty and sixty pounds, to carry customer bags, which could weigh between fifty and seventy pounds, down stairs, and occasionally, to assist handicapped customers by lifting them from their wheelchairs. Id. A third area of work involves the Ramp, where the CSAs load luggage onto the plane, which requires both indoor and outdoor work, even in subfreezing winter temperatures, the repeated lifting of up to seventy pounds, repetitive bending, walking, squatting, kneeling, and climbing. Id. While working the Ramp, CSAs also de-ice aircraft, which requires them to carry a twenty-five to forty pound hose. Id. The fourth area of a CSA's work is in the Airfreight Warehouse. CSAs assigned to that

---

[2]Lisa M. Todd was known as Lisa M. Jandrt at the time of the events pertinent to this action, and she is referred to by both parties, in their briefs, as "Jandrt." Accordingly, we will refer to her as Jandrt, and will, for the sake of clarity, refer to her Affidavit as the "Jandrt Affidavit," although it is entitled "Affidavit of Lisa M. Todd."

position must rotate to Ramp work, during flight activities, and therefore, they are required to do frequent walking. Id. While at the Airfreight Warehouse, a CSA accepts cargo shipments, which requires the lifting of items weighing more than seventy pounds, either by hand, or by forklift.

It is undisputed that, at the Defendant's Duluth location, CSAs must be generalists, since they work at each of the four positions, but that a "local practice" permits employees, with seniority, to express a preference for certain assignments. Due to the Plaintiff's seniority, he could have been assigned to the area of his choice, for most shifts, but he could have also been assigned to any of the four areas, if the need arose.

In March of 1999, the Plaintiff experienced shortness of breath, and he was subsequently diagnosed with congestive heart failure. His treating physician, Dr. James H. Langager, and his internist, Dr. David R. Albright, both advised him that he could not work. Thus, on April 12, 1999, the Plaintiff took a leave of absence, under the Family and Medical Leave Act ("FLMA"), which covered a twelve-week absence. During his FLMA leave, as well as the period thereafter, during which the Plaintiff remained off-of-work, the Plaintiff utilized his accrued sick and vacation time, in order to receive his full level of pay from the Defendant.

During his leave, the Plaintiff communicated with his supervisor, Rita Molitor ("Molitor"), by using "Speed Reply Memo" forms. The Plaintiff sent a series of Speed Reply Memos to Molitor, in which he asked to remain off of the work schedule. According to the Plaintiff, it was always his desire to return to work, but that, originally, his doctors would not permit such a return. Thus, on April 29, 1999, the Plaintiff informed Molitor that he could not return to work until June 9, 1999. See, Exhibit 8 attached to Affidavit of Rita E. Molitor ("Molitor Affidavit"). Thereafter, by a Speed Reply Memo dated June 4, 1999, the Plaintiff asked to remain off of the work schedule until June 29, 1999. Id. He later extended that date to August 4, 1999, by Speed Reply Memo dated June 14, 1999. Id.

At the end of July of 1999, a Customer Service Supervisor ("CSS") position was posted, at the Defendant's Bid Desk, which handles applications for internal job postings. The CSS position was a supervisory position, which involved some administrative duties, such as scheduling CSA job assignments, addressing vacation requests, tracking work hours, processing customer refunds, distributing customer vouchers, and filling out daily reports. During the remainder of the time, the CSS works at the Ramp, or the Ticket Counter, performing the same tasks as would a CSA. The Plaintiff became aware of this posting and, believing from his own observa-

tion of the position, that it would not require him to perform any lifting in cold weather, and that he could perform the duties of the position within the restrictions, which had been placed on him by his physicians, the Plaintiff decided to submit an application for that position.

At some time after the CSS position was posted, but prior to August 4, 2002, Molitor had a conversation with Keith Fulcher ("Fulcher"), who was a CSS at the Duluth airport, during which Molitor and Fulcher discussed the Plaintiff's intention of applying for the CSS position. It is undisputed that Molitor and Fulcher discussed the effect that the Plaintiff's application would have on Fulcher, given that the Plaintiff had more seniority, and could "bump" Fulcher from his daytime, to an evening shift, if the Plaintiff's application was successful. Fulcher advised the Plaintiff about his conversation with Molitor. It is also undisputed that, on August 4, 2002, the posting for the CSS position was withdrawn. Molitor has averred that some question had arisen as to her authority to submit the position for bidding, and that she withdrew the position in order to acquire the requisite permission, which she believed that she could obtain, during a meeting of the Defendant's managers, which was scheduled to be held in Duluth, from August 2 thru 4, 1999.

On August 5, 1999, Molitor posted a Memorandum ("August Memorandum"), which listed as its subject, "Sick/Medical Leave." The August Memorandum stated as follows:

> Effective immediately, anyone who is out on an extended sick/medical leave will be required to provide medical documentation stating that you are fully released and able to perform job duties with no restrictions.
>
> If you have any questions or concerns regarding this matter please do not hesitate to contact me.

Exhibit 15 attached to Molitor Affidavit.

On the following day, August 6, 1999, the CSS position was reposted. Thereafter, on August 17, 1999, the Plaintiff submitted his application for the CSS position. As required by the collective bargaining agreement, which extended between the Defendant and the Plaintiff's union, on August 21, 1999, the Plaintiff took the examination for the CSS position.

On September 21, 1999, the Plaintiff sent another Speed Reply Memo to Molitor, this time requesting that he be taken "off the duty Roster until further notice." Exhibit 8 attached to Molitor Affidavit, at 6. Upon receipt of this request, Molitor wrote to the Plaintiff asking that he provide updated medical documentation from his physician, as he had provided no such documentation since April of 1999. According to his medical records, the Plaintiff telephoned Dr. Langager's office on October 1, 1999, saying that he

needed "some clarification about his ability to return to work." Exhibit 42 attached to Third Affidavit of Matthew E. Johnson ("Third Johnson Affidavit"), at Bates number 0018.

Thereafter, the Plaintiff responded to Molitor's request for a medical update, with a Speed Reply Memo of October 15, 1999, in which he included a note from Dr. Langager that stated that the Plaintiff had been "advised not to work until further notice." Exhibit 10 attached to Molitor Affidavit. The Plaintiff also related that he believed, based upon his last paycheck, that he still had 340 hours of accrued sick time, and 312 hours of accrued vacation time, which "should last until March 1, 2000." Id. The Plaintiff also transmitted, on November 2, 1999, a letter from Dr. Albright, which did not specify whether, or when, the Plaintiff might return to work. Exhibit 11 attached to Molitor Affidavit.

During this time, the Plaintiff also pursued obtaining long-term disability insurance benefits, and he submitted an application to that effect, to the Hartford Insurance Company, on December 10, 1999. In that application, he included a certification by Dr. Langager, dated November 10, 1999, which reported that the Plaintiff was "100% disabled." Exhibit 20 attached to Affidavit of Matthew E. Johnson ("Johnson Affidavit"), at 9-10. The Plaintiff's application for benefits was approved on March 9, 2000.

By letter dated November 22, 1999, the Plaintiff was informed that he had failed his Basic Skills Examination and, as such, was ineligible for further consideration for the CSS position. The position was offered to another employee but, due to a union grievance concerning the bidding process, the Defendant had to rescind that offer, and the Bid Desk reconsidered the original applicants for that position. During the time that had elapsed, between the time at which the Plaintiff had first taken the Basic Skills Test, and the time when the Bid Desk had to reconsider the position, a change in the collective bargaining agreement had resulted in persons being allotted forty-five, instead of thirty minutes, in which to complete the Basic Skills Examination.

Since the Plaintiff had only thirty minutes to take the examination, the Bid Desk concluded that the Plaintiff could retake the test. To that end, Barbara L. Blum, who was, at the time, the senior employee at the Bid Desk, telephoned the Plaintiff, and informed him that he might retake the test on January 21, 2000. However, the Plaintiff did not appear to take that test, and the position was awarded to another individual. The Plaintiff has averred that he did not appear for the retest because he had been told by Molitor, and his union representative, that he could not take the test until he had a set return to work date. See, Reply Affidavit of Dennis A. Beveridge ("Plaintiff's Reply Affidavit").

On January 24, 2000, the Plaintiff filed a charge of Discrimination against the Defendant, with the Minnesota Department of Human Rights. The charge, based largely on the Memorandum of August 5, 1999, alleged that the Defendant had improperly failed to reasonably accommodate the Plaintiff's disability. Upon receiving the charge, the Defendant initiated an accommodations assessment in order to determine whether, with reasonable accommodation, the Plaintiff could perform the essential functions of the CSA position. In accordance with its procedures, the Defendant required the Plaintiff to undergo a fitness-for-duty examination, with Dr. David C. Zanick, who also reviewed the Plaintiff's records, from his treatment with Dr. Langager, and who ultimately concluded that the Plaintiff was unable to work outside in subfreezing weather, could lift no more than 20 pounds frequently, and 35 pounds occasionally, had to limit step climbing to no more than two flights per day, and could not walk rapidly. See, Exhibit 4 attached to Jandrt Affidavit. Based upon these conclusions, Jandrt -- who was the Accommodations Assessment Advisor assigned to the Plaintiff's case -- undertook her review of the Plaintiff's abilities.

According to Jandrt, she telephoned the Plaintiff in order to describe the accommodations assessment process, at which time, the Plaintiff told her that he wanted to go on long-term disability, as Dr. Langager had advised him that he needed an additional year of

recovery. On March 15, 2000, Jandrt conducted a telephonic conference between herself, Molitor, the Plaintiff, and a union representative. The purpose of that conference call was to discuss possible accommodations, for the Plaintiff, in the CSA position. The conclusion reached by Jandrt, at the end of the conference call, was that there was no reasonable accommodation for the Plaintiff's disabilities. Jandrt offered the Plaintiff an opportunity to bid for another position with the Defendant, but the Plaintiff declined her offer. Later, the Plaintiff was informed, by letter, of Jandrt's determination that no reasonable accommodation could be made.

During his leave, the Plaintiff continued to be seen by Dr. Langager. In October of 2000, after ordering a formal work assessment of the Plaintiff, Dr. Langager determined that the Plaintiff was able to return to work without restriction and, on November 29, 2000, he certified that the Plaintiff was no longer disabled. On January 4, 2001, the Plaintiff received notice that his long-term disability insurance benefits would be terminated, on January 15, 2001. The Plaintiff then underwent, at the Defendant's request, a fitness-for-duty examination, and he was certified to be able to return to work without restriction. On January 29, 2001, the Plaintiff resumed his work.

## III. Discussion

A. The Defendant's Motion to Strike.

As a threshold matter, we briefly address the Defendant's Motion to Strike the Plaintiff's Reply papers, before addressing the parties' cross-Motions. The Defendant asks that we strike the Plaintiff's Reply Memorandum, as well as his Reply Affidavit. As to the Reply Memorandum, the Defendant asserts that the document was, in reality, an improper Surreply to the Defendant's Motion for Summary Judgment, and was not a Reply to the Defendant's Response to the Plaintiff's Motion for Summary Judgment. For this reason, and because this Memorandum was served on the Defendant four days after the agreed-upon filing deadline, the Defendant asks that the Memorandum be stricken.

As we related, at the time of the Hearing, we do not find cause to strike the Reply Memorandum. The delay in service appears to have been the product of a clerical error, made by a secretary in the Plaintiff's office, and we are persuaded that the Plaintiff obtained no benefit from that brief delay. Further, our review of the Plaintiff's Reply Memorandum convinces us that it was a proper reply to the Defendant's Response, as it fairly traces the arguments advanced by the Defendant in its Response Memorandum. Accordingly, we are presented with no legitimate reason to strike the Memorandum.

The Defendant urges that, even if we do not strike the Reply Memorandum, we should, nonetheless, strike the Plaintiff's Reply Affidavit as, under Local Rule 7.1(b)(2), "[r]eply affidavits are appropriate only when necessary to address factual claims of the responding party that were not reasonably anticipated," and "[i]t is improper to withhold information -- either from discovery or from initial moving papers -- in order to gain advantage." D. Minn. LR7.1, Advisory Committee Note to 1999 Amendment. According to the Defendant, the Plaintiff's Reply Affidavit contains factual statements which were not previously submitted by the Plaintiff, either in support of his Motion, or in opposition to the Defendant's Motion, even though those facts would have been relevant to those issues as well. The Plaintiff disagrees, and concludes that his Reply Affidavit was appropriate, and necessary, in order to address the claims of the Defendant that had not been reasonably anticipated.

In this respect, we note that the Plaintiff's Reply Affidavit contains only two statements, both of which concern testing for the CSS position. Although we agree with the Defendant, that those facts could arguably have been relevant to the issues which were raised earlier in the pleading process, we find the Reply Affidavit to be directly responsive to the Defendant's contention, in its Memorandum of Law in Opposition to Plaintiff's Motion for Summary

Judgment, that the Plaintiff was offered the opportunity to retest for the CSS position, after having failed the initial testing, but that he failed to appear for that testing. Accordingly, in order to be fully informed, without prejudice to the Defendant, and since the Reply Affidavit does not violate our Local Rules, we decline to strike it. Therefore, the Defendant's Motion to Strike is denied.

B. The Parties' Cross-Motions for Summary Judgment.

Summary Judgment is not an acceptable means of resolving triable issues, nor is it a disfavored procedural shortcut when there are no issues which require the unique proficiencies of a Jury in weighing the evidence, and in rendering credibility determinations. See, Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986). Summary Judgment is appropriate when we have viewed the facts, and the inferences drawn from those facts, in a light most favorable to the nonmoving party, and we have found no triable issue. See, Duffy v. McPhillips, 276 F.3d 988, 991(8th Cir. 2002); Schoolhouse Inc. v. Anderson, 275 F.3d 726, 728 (8th Cir. 2002); Krentz v. Robertson Fire Protection Dist., 228 F.3d 897, 901 (8th Cir. 2000); Curry v. Crist, 226 F.3d 974, 977 (8th Cir. 2000); Carter v. St. Louis Univ., 167 F.3d 398, 400 (8th Cir. 1999). For these purposes, a disputed fact is "material," if it must inevitably be resolved and the resolution will determine the outcome of the case, while a dispute is "genuine," if the evidence is such that a reasonable Jury could re-

turn a Verdict for the nonmoving party. See, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Herring v. Canada Life Assurance, 207 F.3d 1026 (8th Cir. 2000); Austin v. Minnesota Mining and Manuf. Co., 193 F.3d 992, 995 (8th Cir. 1999); Liebe v. Norton, 157 F.3d 574, 578 (8th Cir. 1998); Peter v. Wedl, 155 F.3d 992,996 (8th Cir. 1998).

As Rule 56(e) makes clear, once the moving party files a properly supported Motion, the burden shifts to the nonmoving party to demonstrate the existence of a genuine dispute. In sustaining that burden, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavit or as otherwise provided in this Rule, must set forth specific facts showing that there is a genuine issue for trial." Rule 56(e), Federal Rules of Civil Procedure; see also, Anderson v. Liberty Lobby, Inc., supra at 256; Allen v. Entergy Corp., 181 F.3d 902, 904 (8th Cir. 1999); Jauregui v. Carter Manufacturing Co., 173 F.3d 1076, 1085 (8th Cir. 1999). Moreover, the movant is entitled to Summary Judgment where the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, supra at 322; see also, Hammond v. Northland Counseling Center, Inc., 218 F.3d 886, 891 (8th Cir. 2000); Greer v. Schoop, 141 F.3d 824, 826 (8th Cir. 1998). No

genuine issue of fact exists in such a case because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, supra at 323; see also, Bell Lumber and Pole Co. v. United States Fire Ins. Co., 60 F.3d 437, 441 (8th Cir. 1995); McLaughlin v. Esselte Pendaflex Corp., 50 F.3d 507, 510 (8th Cir. 1995); Settle v. Ross, 992 F.3d 162, 163 (8th Cir. 1993).

1. Standard of Review. Under the Americans with Disability Act,[3] an employer may not discriminate against any "qualified individual with a disability." Title 42 U.S.C. §12112(a). In this context, "[d]iscrimination includes 'not making reasonable accommodations to the known physical and mental limitations of an otherwise qualified individual with a disability * * * unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]." Heaser v. The Toro Co., 247 F.3d 826, 830 (8th Cir. 2001), quoting Title 42 U.S.C. §12212(b)(5)(A)(alterations in original). "To

[3]The Plaintiff has asserted claims under both the ADA, and the MHRA. Actions under these two acts are considered under the same standards. See, Heaser v. The Toro Co., 247 F.3d 826, 830 n. 2 (8th Cir. 2001); Wilking v. County of Ramsey, 153 F.3d 869, 872 (8th Cir. 1998). Accordingly, although we discuss only the ADA in the text of this Order, since the Plaintiff's MHRA claim is "co-extensive" with his ADA claim, our analysis has equal application to the Plaintiff's claim under the MHRA. Maziarka v. Mills Fleet Farm, Inc., 245 F.3d 675, 678 n. 3 (8th Cir. 2001).

establish a prima facie case of discrimination under the ADA, [the Plaintiff] must establish that (1) he is disabled within the meaning of the ADA; (2) he is qualified to perform the essential functions of his job with or without reasonable accommodation; and (3) he suffered an adverse employment action under circumstances that give rise to an inference of unlawful discrimination based on disability." Dropinski v. Douglas County, 298 F.3d 704, 706 (8th Cir. 2002), citing Greer v. Emerson Elec. Co., 185 F.3d 917, 921 (8th Cir. 1999); see also, Alexander v. The Northland Inn, --- F.3d ---, 2003 WL 865072 at *2 (8th Cir., March 5, 2003); Moritz v. Frontier Airlines, 147 F.3d 784, 785 (8th Cir. 1998); Benson v. Northwest Airlines, Inc., 62 F.3d 1108, 1112 (8th Cir. 1995).

Accordingly, the Plaintiff retains the burden of persuading the factfinder that he has been the victim of illegal discrimination because of his disability. See, Dropinski v. Douglas County, supra at 707 (the Plaintiff "retains the ultimate burden of proving that he is the qualified individual * * *."); Benson v. Northwest Airlines, supra at 1112. If, however, the Plaintiff makes a prima facie showing, that a reasonable accommodation is possible, the burden of production then shifts to the Defendant to "demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]." Id.; Cravens v. Blue Cross and Blue Shield of Kansas City, 214 F.3d 1011, 1016 (8th Cir.

2000). If the Defendant makes the requisite showing -- namely, that the Plaintiff cannot perform the essential functions of his job, even with accommodation -- then the burden shifts back to the Plaintiff to produce evidence showing that his individual abilities can satisfy those functions, and his burden of production once again merges with his burden of persuasion. Id.

2. Legal Analysis. The Plaintiff has asserted three discrete violations of the ADA. First, he claims that the August Memorandum, in and of itself, was a *per se* violation of the ADA, because its "no restrictions" policy impermissibly prevented employees from requesting accommodations, in violation of Section 12112 of the ADA. Second, the Plaintiff contends that the Defendant violated the ADA by failing to engage him in a proper interactive process, in order to determine whether he could perform the essential functions of his CSA position, with an accommodation. Thirdly, the Plaintiff contends that the Defendant violated the ADA by precluding him from applying for the CSS position, by requiring that he have a return to work date before he could complete that application. We address these contentions in turn.

a. Is the Defendant's Policy a Per Se Violation of the ADA?

The Plaintiff asserts that the policy embodied in the August Memorandum, which was posted by Molitor, was a "no re-

strictions" policy that is, on its face, violative of the ADA. According to the Plaintiff, because such policies require that an employee be without any restriction then, by definition, an employee who had some restriction could not request an accommodation, "because the internal policy itself declines the accommodation before it can even be requested." Plaintiff's Memorandum in Support of Motion for Summary Judgment, at 4.

We agree with the Plaintiff, that a "100 percent healed" policy could be a per se violation of the ADA, because it would, "on its face[,] 'discriminate against a qualified individual with a disability because of the disability of such individual.'" Hutchinson v. United Parcel Service, Inc., 883 F. Supp. 379, 396 (N.D. Iowa 1995), quoting Title 42 U.S.C. §12112(a); see also, McGregor v. National Railroad Passenger Corporation, 187 F.3d 1113, 1116 (9th Cir. 1999); Heise v. Genuine Parts Co., 900 F. Supp. 1137, 1154 n. 10 (D. Minn. 1995)(holding that a "must be cured" policy is a per se violation of the ADA). Such a policy would ignore the individualized assessment that is required by the ADA, in favor of a categorical, generalized appraisal, and thus, would "run[] afoul of the ADA." Id. at 397. Nevertheless, we conclude that the Plaintiff cannot successfully assert a per se violation of the ADA, here, as we find, as a matter of law, that the Defendant does not, and never

did have, a "100 percent healed" policy that precluded disabled individuals from seeking a reasonable accommodation.

The Plaintiff's claim, that the Defendant had such a policy, stems from the August Memorandum, and from his inferences as to the meaning of the Memorandum. The Plaintiff contends that the August Memorandum, by its plain terms and, as interpreted by him, reflected a policy that no one could return to work after leaving for medical reasons, unless that person was 100 percent healed. We conclude, however, that no reasonable Jury could find, on this Record, that the Defendant maintained such a policy. While we recognize that the Memorandum is facially suggestive, the Memorandum does not stand alone, and is not so monolithic, in its import, so as to displace all of the other evidence of Record.

Quite plainly, the Memorandum does not suggest that, apart from the requisites of the job at issue, the Plaintiff must be 100 percent healed before he could return to work. See, <u>Lenker v. Methodist Hospital</u>, 210 F.3d 792, 798 (7th Cir. 2000)(noting that requirement that "an employee with a lifting restriction would not be allowed to return to work until that restriction was removed because lifting was an essential function of the job that could not be accommodated," " is a far cry from saying that [employee's] [multiple sclerosis] must be 100% healed before being allowed to

return to work."). To the contrary, the Memorandum is job specific.

Our conclusion, that the August Memorandum is not a per se violation of the ADA, is further supported by additional considerations. First, the Memorandum does not expressly accomplish what the Plaintiff claims it does. Although the Memorandum appears to imply a "100 percent healed" requirement, it does not specify, on its face, that it applies to disabled employees, much less disabled employees who seek to work with an accommodation. Rather, the Memorandum refers to persons who return to work after one form of medical, or sick leave, or another. While the Plaintiff was on a medical leave, because of a disabling illness, it is his disability that required an accommodation, not the fact that he was on a medical leave. Simply stated, the ADA does not prohibit the Defendant from having a policy, which would require that persons, who were out on sick or medical leave, but who did not meet the definition of a disabled person under the ADA, be healed before returning to work. See, e.g., Alexander v. The Northland Inn, supra at *3 ("The ADA does not require an employer to permit an employee to perform a job function that the employee's physician has forbidden."). Such a policy would not, in and of itself, offend the ADA. See, Hutchinson v. United Parcel Service, supra at 398.

Nor can it be fairly said that the August Memorandum contemplated something other than an individualized assessment of the capabilities of those persons who were interested in returning to work. Rather, we find that a fair reading of the August Memorandum discloses a benign, and fully legitimate policy, of assuring that those who are injured should be allowed to return to work when they provide medical documentation stating that they were fully released, and able to perform the job duties without restriction.[4] Quite obviously, the Memorandum did not obligate an employee to demonstrate that he or she was physically capable of performing any job, for the focus of the Memorandum was the capacity of the employee to perform the duties of a specific job. More importantly,

---

[4]We do not suggest that the language of the Memorandum could withstand improvement, but our duty is to read words for what they denote, and not for what they may subjectively connote to one who has an interest in the matter. While the Plaintiff reads the Memorandum as stating that persons cannot return to work with restrictions, that reading is faulty. The Memorandum states that an employee cannot return to a job if he or she is unable to perform the job without restriction. In other words, if an essential function of the job requires lifting weights greater than fifty pounds, then the employee should not return to that job unless he or she can lift greater than fifty pounds. To allow otherwise would promote a reinjury -- a prospect that the ADA does not foster.

Similarly, we do not construe the Memorandum as conveying the meaning that Molitor avers as being her intent. According to Molitor, the Memorandum was her effort to rectify a prior error, on her part, in allowing those who are out on a temporary medical leave, that arose from a non-work related injury, to return to a light-duty job. However, objectively read, the August Memorandum does not disclose any such intent.

the Memorandum specified that the employee was required to present medical documentation which, plainly, would be unique to him, or her, in the context of the job to which they sought to return.

In addition, we have no showing that the August Memorandum constituted either a "policy" of the Defendant, or effectuated any program that denied any employee, including the Plaintiff, a job. First, the Defendant has presented evidence of its written company policy concerning the accommodation of disabled individuals, and that evidence is uncontroverted. Jandrt, whose job it was to implement the Defendant's accommodation policies, has averred that, "[a]t all times, * * * [the Defendant's] policies required an individualized assessment of an employee in [the Plaintiff's] situation to determine whether he or she could perform the essential functions of his or her job, with or without an accommodation." Jandrt Affidavit, at 7-8.

In addition, the Defendant's official policy, as enunciated in its "Accommodations Guide," expressly provided that the Defendant "prohibits discrimination against an otherwise qualified disabled applicants or employees who, with or without reasonable accommodation, can perform the essential functions of a particular job," and that the Defendant "will make reasonable accommodations to enable qualified people with disabilities to participate in the job application process, [and] employment * * *." Exhibit 27 to

<u>Johnson Affidavit</u>. The Accommodations Guide provides a definition of disabled, explains what job functions are considered essential, and gives examples of what types of accommodations might be reasonable. Further, it expressly represents that the Defendant "take[s] all accommodations requests into consideration," and would be responsible for assessing the feasibility, and reasonableness, of any accommodation. <u>Id.</u> The Guide also details the means by which an employee might seek various types of accommodations.

Further, the policy expressly allows for the ability of a disabled person to return to work with an accommodation, and for an individual assessment as to the feasibility, and reasonableness, of any accommodation that could be made. We find no evidence, in this Record, that the Plaintiff has competently rebutted the existence, or application, of these accommodation policies. In fact, once the Plaintiff made known to the Defendant, that he was interested in an accommodation, his interest was explored, and was not rejected on the basis of the supposed "100 percent healed" policy.

More importantly, the Plaintiff has failed to demonstrate that the August Memorandum was operative in denying any employee of the Defendant an opportunity to request, and substantiate, the need for a reasonable accommodation, inclusive of the Plaintiff. We are mindful, of course, of the Plaintiff's contention that his interpretation of the Memorandum caused him to defer taking certain

acts, but he has presented nothing to so much as suggest that the Memorandum was effective in displacing the duly promulgated policies of the Defendant, which were applicable to the Defendant's disabled employees who should choose to return to work. Absent from the Plaintiff's proof is any showing, however slight, that any employee of the Defendant was unable to return to work by virtue of the August Memorandum.[5]

Accordingly, we find that the Plaintiff's reliance on a per se violation of the ADA is without merit, and we deny his Motion for Summary Judgment, on that basis, as a matter of law.

---

[5]Notably, notwithstanding the invitation, at the close of the August Memorandum, for any employee having questions, or concerns about the content of the Memorandum, to speak with Molitor, the Record is uncontested that the Plaintiff never spoke to Molitor on that subject. Further, the Plaintiff never submitted the Memorandum to Dr. Langager, but merely presented his interpretation of the Memorandum to Dr. Langager. Exhibit 17 to Johnson Affidavit, at p. 44. Nor did the Plaintiff ask Dr. Langager to contact anyone at the Defendant to suggest any accommodations for the Plaintiff. Indeed, notwithstanding the August Memorandum, the Plaintiff sought a promotion to the CSS position which, the Record discloses, required the same heavy lifting, in cold air -- a work restriction that Dr. Langager had prescribed for the Plaintiff. Lastly, the Record reflects that the Plaintiff was aware of one other employee of the Defendant, who had suffered a heart attack, and who had received a work accommodation that allowed his return to work, and he also knew of an employee who returned to maintenance work with his arm in a sling, and yet the Plaintiff had no recollection of raising those obvious contradictions, to his understanding of the August Memorandum, to Molitor's attention. Id. at pp. 46-50.

b. The Plaintiff's Claims Involving the CSA Position.

As to the CSA position, the Plaintiff argues that, notwithstanding the fact that the Defendant was aware of his interest in returning to work with an accommodation, it failed to engage him in the interactive process that is required by the ADA. The Defendant disagrees, and maintains that the Plaintiff did not make it aware that he was desirous of an accommodation, until he filed his MHRA claim, after which it did engage him in the required interactive process. In response, the Plaintiff asserts that, even if we were to find that he had not made the Defendant aware of his desire to return to work, with an accommodation, his failure to do so was excused by the August Memorandum, which made any such request a futile gesture. Further, he contends that the interactive process, in which the Defendant purportedly engaged after being made aware of his interest in an accommodation, was inadequate. We conclude, however, that the Defendant is entitled to Summary Judgment on the Plaintiff's claims which involve the CSA position.

1) Standard of review. An employee may assert a claim for discrimination, against an employer, for "not making reasonable accommodations to the known physical and mental limitations of an otherwise qualified individual with a disability, * * * unless [the employer] can demonstrate that the accommodation would

impose an undue hardship on the operation of the business of [the employer]." Heaser v. The Toro Co., supra at 830, quoting Title 42 U.S.C. §12212(b)(5)(A)(alterations in original). A predicate to making such a claim, however, is a finding that the employee requested an accommodation from his or her employer. The general rule, that "it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed," Mole v. Buckhorn Rubber Products, Inc., 165 F.3d 1212, 1217 (8th Cir. 1999), exists because an employee "cannot 'expect the employer to read [his or her] mind and know [he or she] secretly wanted a particular accommodation and [then] sue the employer for not providing it." Id., citing Ferry v. Roosevelt Bank, 883 F. Supp. 435, 441 (E.D. Mo. 1995).

As a result, "[t]o show that an employer failed to participate in this interactive process, the employee must first demonstrate that "'1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith.'" Ballard v. Rubin, 284 F.3d 957, 960 (8th Cir. 2002), quoting Fjellestad v. Pizza Hut of America, Inc., 188 F.3d 944, 951 (8th Cir. 1999), quoting, in turn, Taylor v. Phoenixville School

District, 174 F.3d 142, 165 (3rd Cir. 1999). "The mere failure of an employer to engage in the interactive process does not give rise to per se liability, although for summary judgment purposes such failure is considered prima facie evidence that the employer may be acting in bad faith." Id.

2) Legal Analysis. There is no dispute, in the Record presented, that the Defendant knew of the Plaintiff's disability, at least as it appeared at the relevant time. Thus, to prevail on this claim, the Plaintiff need only prove the remaining three elements. In actuality, however, the crux of his claim rises, or falls, on the second element -- namely, whether the Plaintiff ever alerted the Defendant to his interest in returning to work with an accommodation and, if he did, when that notification occurred.

As we have noted, the Defendant denies that the Plaintiff ever requested any accommodation for his disability, prior to the time that he filed his MHRA claim. The Plaintiff argues, however, that he made it known to the Defendant, that he wanted to return to his CSA position with an accommodation. Alternatively, the Plaintiff contends that, if he did not so alert the Defendant, then his failure to do so was excused by the August Memorandum, under the "futile gesture" doctrine.

We need not long dwell on the Plaintiff's assertion that, even prior to his filing of his MHRA claim, he had alerted the Defendant to his interest in seeking an accommodation, for we find no evidence, in this Record, to support that contention. In fact, all of the evidence proves to the contrary. At his deposition, when the Plaintiff was asked if his statement was true that, after he "received the memorandum," he "did not inform [the Defendant] of [his] work restrictions," he admitted that it was true, he had not. See, Exhibit 39 attached to Second Affidavit of Matthew E. Johnson, at numbered 119. Notwithstanding that admission, under oath, the Plaintiff maintains that he has raised a material issue of fact, as to his provision of notice concerning the need for an accommodation, in that he had a "discussion about coming back to duty with restrictions with Ms. Molitor," by submitting an application for the CSS position, and by discussing his desire to return to work with co-workers. Plaintiff's Reply Memorandum, at 7. The Plaintiff urges that these "undisputed facts" are sufficient to present a genuine factual issue as to whether he requested an accommodation from the Defendant. We disagree.

As to his first contention -- that he discussed, with Molitor, coming back to work with restrictions -- we have found no evidence, in this Record, which supports such an assertion. In his Reply Memorandum, in which he asserts that he discussed that topic with

Molitor, the Plaintiff cited to "Bev., 29-31" which, we believe, based upon the key provided by the Plaintiff, is a reference to the Plaintiff's deposition. However, having reviewed the entirety of the Record before us, we have no showing that the referenced pages were ever submitted for our review. Instead, we find ample evidence to support a conclusion, as a matter of law, that the Plaintiff did not relay any desire to be accommodated to Molitor.

In her Affidavit, Molitor has sworn that the Plaintiff "had never indicated to [her] in any way, either orally or in writing, that he wanted an accommodation that would allow him to return to work, that [Molitor] was not providing him with an accommodation to which he believed that he was entitled, or that [the Defendant] had failed to abide by its legal duty to accommodate him." Molitor Affidavit, at 5. The Plaintiff has introduced no evidence that he asserted any accommodation request to Molitor in writing, and we have found no evidence of an oral conversation, between Molitor and the Plaintiff, that occurred after the start of his leave, much less one in which he requested an accommodation. Accordingly, we find the Plaintiff's argument, on this score, to be without evidentiary support.

Further, we reject the Plaintiff's contention, that his application for the CSS position -- which, admittedly, he believed he could perform without any accommodation -- was sufficient to inform

the Defendant that the Plaintiff was seeking an accommodation. Nowhere in that application, or in the application process, did the Plaintiff ever suggest that he needed an accommodation to perform the duties of the CSS position. In fact, Molitor has averred that the Plaintiff "never asked [her] for a reasonable accommodation that would have allowed him to perform the essential functions of the CSS position in the event that he was selected for that position." Second Affidavit of Rita M. Molitor, at 5. Had the Plaintiff done so, then a different Record would be presented, but having failed to demonstrate, that a request for accommodation was made by him, we reject his implicit notion that the Defendant should be expected to "mind read" his unexpressed interest in obtaining an accommodation. See, Mole v. Buckhorn Rubber Products, Inc., supra at 1217. Thus, even when we construe the Record in a light most favorable to the Plaintiff, we are unable to conclude that the Plaintiff has competently demonstrated that he placed the Defendant on notice of his desire to return to work as a CSA, with accommodation.

Likewise, we conclude that the Plaintiff's assertion, that his conversations with co-workers would be sufficient to put the Defendant on notice of his interest in being accommodated, is without merit. Even if his conversations could provide the required notice to the Defendant -- an issue we need not now resolve -- there is

simply no evidence to so much as suggest that he ever discussed a desire to be accommodated with any co-worker. The only specific evidence we have, as to any conversation with a co-worker, refers to the Plaintiff's conversation with Fulcher about the Plaintiff's CSS application -- a conversation which was related to Molitor. However, the Plaintiff has not averred that he spoke with Fulcher about a desire to be accommodated, but only that they spoke about his application for the CSS position. Thus, we find nothing, in this Record, to corroborate the Plaintiff's allegation that he spoke with co-employees about a desire to be accommodated.

At the Summary Judgment stage, the Plaintiff is required to do more than merely advance allegations, as he must "set forth specific facts showing that there is a genuine issue for trial." Rule 56(e), Federal Rules of Civil Procedure. As to his allegation, that he had advised the Defendant of wanting to be accommodated, even before the filing of his MHRA charge, the Plaintiff has failed to provide anything more than mere allegation. Accordingly, we conclude that the Defendant was not placed on any notice of the Plaintiff's desire to return to work with accommodation, prior to his filing of an MHRA complaint, and we turn to whether the Plaintiff was excused from that failure, under the futile gesture doctrine. Again, we are obligated, by the Record presented, to hold that he is not.

The futile gesture doctrine arose from the Supreme Court's holding, in International Brotherhood of Teamsters v. United States, 431 U.S. 324, 366 (1977). There, the Supreme Court recognized that "[a] consistently enforced discriminatory policy can surely deter job applications from those who are aware of it and are unwilling to subject themselves to the humiliation of explicit and certain rejection." Id. at 365. Thus, "[i]f an employer should announce his policy of discrimination by a sign reading 'Whites Only' on the hiring-office door, his victims would not be limited to the few who ignored the sign and subjected themselves to personal rebuffs." Id. As a result, "a person [whose] desire for a job is not translated into a formal application solely because of his unwillingness to engage in [such] a futile gesture, * * * is as much of a victim of discrimination as is he who goes through the motions of submitting an application." Id. Under the futile gesture doctrine, "[i]n order for a nonapplicant plaintiff to merit relief, he has 'the not always easy burden of proving that he would have applied for the job had it not been for [the employer's discriminatory] practices.'" Davoll v. Webb, 194 F.3d 1116, 1132-33 (10th Cir. 1999), quoting International Brotherhood of Teamsters v. United States, supra at 368.

In passing the ADA, Congress specifically intended that the "futile gesture doctrine enunciated in Teamsters [should] appl[y]

to employment actions." Id. at 1132, citing H.Rep.No. 101-485(II) at 82-83 (1990), reprinted in U.S.C.C.A.N. 303, 365; S.Rep. No. 101-116 at 43 (1989). As a consequence, in ADA cases, the futile gesture doctrine has been applied in instances where "an employer has a set policy against a particular type of reasonable accommodation, or against such accommodation generally," such that, if an individual "actually knows of an employer's discriminatory policy against reasonable accommodation, he need not ignore the policy and subject himself 'to personal rebuffs' by making a request [for accommodation] that w[ould] surely be denied." Id.

However, it is clear that, under the futile gesture doctrine, at least as applied to the ADA, "an employee's subjective belief about the futility of initiating the interactive process will not, by itself, relieve him or her of th[e] obligation" to invoke such a process. Id., citing Loulseged v. Akzo Nobel Inc., 178 F.3d 731, 739 (5th Cir. 1999). It is "[o]nly in the rare case where an employer has essentially foreclosed the interactive process through its policies or explicit actions [that] the futile gesture doctrine [will] apply." Id. at 1133.

In support of his contention, that his failure to request an accommodation was excused by the futile gesture doctrine, the Plaintiff cites to Davoll, where the plaintiffs were police officers who could not continue in their positions because of their in-

ability to fire their weapons due to their disabilities.[6] The Court of Appeals for the Tenth Circuit concluded, initially, that the employer should be required to consider transferring the plain-

---

[6]The Plaintiff also relies upon Bultemeyer v. Fort Wayne Community Schools, 100 F.3d 1281 (7th Cir. 1996), but we conclude that the decision is inapposite here. In Bultemeyer, a psychologically disabled janitor was told, by his employer, that "he would not receive any special accommodations" when he returned from leave. After visiting the school where he was to be assigned, the plaintiff informed his employer that he could not work at that location, and then neither appeared for the required physical, nor for his first day of work. A few days later, the plaintiff's doctor sent a letter to the plaintiff's employer stating that it would be in the plaintiff's best interest to be assigned to a less stressful position. When he received no response to that letter, the plaintiff filed an ADA claim, asserting a failure to accommodate.

The Court recognized that the plaintiff had not expressly asked his employer for an accommodation, but felt that "properly participating in the interactive process means that an employer cannot expect an employee to read its mind and know that he or she must specifically say 'I want a reasonable accommodation," particularly when the employee has a mental illness." Id. at 1285. Thus, the Court concluded that, having received the letter from the plaintiff's doctor, and given the defendant's knowledge of the plaintiff's mental illness, the employer had a duty to "meet the employee halfway," such that, "if it appears that the employee may need an accommodation but doesn't know how to ask for it, the employer should do what it can to help." Id. at 1285.

Bultemeyer does not advance the Plaintiff's argument, that it would have been futile for him to seek an accommodation from the Defendant. There, the plaintiff had attempted to request an accommodation, even in the face of an explicit statement, by his employer, that he would not receive any special treatment, and the Court concluded that the attempt was sufficient to require something more, in the way of an interactive process, from the defendant. As we have detailed, here the actions of the Plaintiff failed to place the Defendant on notice that he was requesting an accommodation. Therefore, we find Bultemeyer inappropriate as support for the Plaintiff's futile gesture argument.

tiffs to other positions as an accommodation, as there were no accommodations which would have allowed the plaintiffs to remain in their police officer positions. However, any possibility of accommodation, through such a transfer, was foreclosed by the defendant's express policy against transferring disabled police officers to the one position to which they might be transferred. The Court recognized that the combination of the plaintiff's awareness of that policy, together with the defendant's express statement, that it would not help them locate other positions, worked to "effectively indicate[] that the [defendant] had no intention of engaging in the interactive process in good faith." Id. at 1133. As such, the plaintiffs were excused from requesting accommodations by the futile gesture doctrine, since their failure to do so was the "logical result of the [defendant's] position." Id.

Notwithstanding the Plaintiff's argument to the contrary, we find that the same factual circumstances, which confronted the Court in Davoll, are not presented here. As noted, the Plaintiff contends that the August Memorandum effectively informed him, that the Defendant had no intention of engaging in an interactive process in good faith, thereby excusing him from making an accommodation request. While we have already rejected the argument, that the August Memorandum had any such import, even if we assumed that the Plaintiff's understanding of the Memorandum's purport was cor-

rect, that understanding, in and of itself, would not be sufficient to afford the Plaintiff the exemption, from providing notice of an interest in accommodation, that he seeks under the futile gesture doctrine. See, Davoll v. Webb, supra at 1132.

The unscalable obstacle, to the Plaintiff's reliance upon the futile gesture doctrine, is his failure to demonstrate that the Defendant had a "100 percent healed" policy. If such a policy had existed then, perforce, it could have rendered futile any request, by a disabled person, for an accommodation, because the disabled would not be allowed to return to work absent being 100 percent healed. Here, however, no such policy existed, such that the Plaintiff could be excused from requesting an accommodation. Given the underlying rationale of Teamsters, that "[a] **consistently enforced discriminatory policy** can surely deter job applications from those who are aware of it and are unwilling to subject themselves to the humiliation of explicit and certain rejection," the result we reach is compelled by both law, and logic. International Brotherhood of Teamsters v. United States, supra at 366 [emphasis added]. Here, we have no policy, must less a consistently enforced discriminatory policy, that would be expected to deter the Defendant's employees from seeking an accommodation in order to return to work. All we have is the Plaintiff's subjective belief in the

existence of such a policy which, under the governing law, is not enough.

At the Hearing on this Motion, the Plaintiff argued that any such conclusion would be inappropriate, as it would require us to find that he was unreasonable in not approaching his employer for an accommodation, in the face of the August Memorandum, which is a question, he argued, that should be left with the Jury. The argument, however, clearly misses the point. Under the governing law, the Plaintiff must initiate the interactive process by requesting an accommodation from the employer, and this the Plaintiff did not do. His only excuse for that failure is the August Memorandum, as augmented by the futile gesture doctrine. Left unproven, however, is a requisite showing that the alleged policy of discrimination, that the Plaintiff identifies, was consistently enforced or practiced. The deficiency in the Plaintiff's proof is fatal.

As International Brotherhood makes plain, the futile gesture doctrine is predicated the existence of a pattern and practice of discrimination which is "entrenched," "gross and pervasive." International Brotherhood of Teamsters v. United States, supra at 367. No such showing has been made, here. As our Court of Appeals has recently reasoned, in the context of an individualized claim of discrimination, absent a showing that "there was a consistently enforced practice of refusing to [accommodate disabled employees],

such that a [request for accommodation] would face 'certain rejection,'" "no reasonable person could conclude from the present record that 'gross and pervasive discrimination' made it futile [for the Plaintiff] to apply for [an accommodation]." Lockridge v. Board of Trustees of the Univ. of Arkansas, 315 F.3d 1005, 1011 (8th Cir. 2003)[en banc].

The Record demonstrates that the August Memorandum was posted, but the Plaintiff has not shown that, even as he reads the Memorandum, it had continued a practice previously in existence, or had any effect, other than what the Plaintiff self-proclaims, in deterring requests for an accommodation. Rather, the Plaintiff suggests that we find something sinister in the sequence of events provided by the posting, the withdrawal, and the re-posting of the CSS position, as coupled with the publication of the Memorandum. We are unable to make the leap from logic that the Plaintiff encourages. Beyond the absence of any evidence that reveals a consistently practiced effort to deny, foreclose, or deter, accommodation requests, the Plaintiff offers only his subjective belief that something sinister was afoot, as he offers nothing to support his suspicions. Accordingly, we conclude that the futile gesture doctrine does not excuse the Plaintiff's failure to seek an accommodation from the Defendant, as there is no competent showing that the Defendant had a consistently enforced policy of discriminating

against the disabled, by ignoring, or rejecting out-of-hand, their requests for a reasonable accommodation. We do not conclude, however, that the Plaintiff should be foreclosed from asserting his claim of discrimination, as he subsequently -- though indirectly -- made a request for an accommodation, to which the Defendant responded.

As to that request, the Plaintiff argues that, even after the Defendant was made aware of his desire to be accommodated, it failed to engage in a good faith effort to accommodate him, and that, but for the Defendant's bad faith, his disability could have been accommodated. Much of this argument is premised on the Plaintiff's assertion that the Defendant failed to engage him in an accommodations process at an earlier time but, given our conclusion that the Defendant was not aware that the Plaintiff was interested in an accommodation until he filed his MHRA charge, that aspect of his argument is not sustainable. As a result, we turn to the Defendant's accommodations assessment, after it became aware of the Plaintiff's interest in an accommodation when he filed MHRA claim.

The Plaintiff characterizes the Defendant's accommodation efforts as a "sham attempt to create an after-the-fact interactive process," and he condemns it as "far less than interactive." Plaintiff's Memorandum in Response to Defendant's Motion for Summary Judgment, at 16. The Plaintiff asserts that, first, he was

ordered "to a clandestine I[ndependent] M[edical] E[xamination] with an unknown doctor at the risk of termination," and that, when he sought the results of that examination, so as to share them with his treating physician, he was refused that request, and was, again, threatened with a charge of insubordination. Id.

The Plaintiff also claims that, because his physician had abandoned the prescription of specific restrictions on the Plaintiff's activities, based upon the Plaintiff's characterization, to Dr. Langager, as to the impact of the August Memorandum -- an assertion borne out by the deposition of the doctor -- there was no way to ascertain his real restrictions, apart from "Dr. Zanicks' after-the-fact, self-serving, internal and secret 'findings.'" Plaintiff's Reply Memorandum, at 4. Further, the Plaintiff objects to the fact that neither his treating physician, nor his counsel, were permitted to audit the telephone conference, that had been conducted by Jandrt, in order to address the issues involving in accommodation process. Finally, the Plaintiff disagrees with the Defendant's conclusion, that he could not be accommodated, and he disputes the notion that "someone in Minneapolis (Jandrt) who had never met [the Plaintiff] was capable of determining whether he could or could not perform a job with or without an accommodation by looking at paper, when the paper they are holding bears no

rational relationship to the duties which are being performed on the site in fact." Plaintiff's Reply Memorandum, at 7.

Given the Record presented, however, we conclude that the Plaintiff has failed to raise a materially disputed fact, concerning the Defendant's good faith in engaging the Plaintiff in an interactive assessment process. While we agree that being ordered to undergo an IME, on the threat of insubordination, being denied a copy of the IME report, thereby frustrating his effort of obtain his own physician's input on the results of that assessment, and being denied a request to have his attorney, and his physician, audit the telephonic assessment conference, were less than, as the Plaintiff suggests, "warm and encouraging" acts, we are unable to conclude that the Plaintiff was denied a responsible effort to engage him in the interactive process prescribed by the ADA.

"To determine whether an accommodation is reasonable and satisfies the ADA, a court must conduct a second burden-shifting analysis within the larger burden shifting McDonnell Douglas scheme." Burchette v. Target Corporation, 2002 WL 31398774 at *3 (D. Minn., October 16, 2002), citing Fjellstad v. Pizza Hut of America, Inc., supra at 950 (8th Cir. 1999). In Fjellestad, the Court concluded that the employee had raised a question of material fact as to whether her employer had made a good faith effort to engage in an interactive process. There, after the plaintiff's acci-

dent, her employer warned her about her declining performance, and she requested an accommodation. Instead of providing an accommodation, her employer put her on a sixty-day performance plan, and terminated her after she failed to meet those expectations, without discussing accommodation.

In holding that there was a sufficient showing to raise a question of material fact concerning the employer's good faith in conducting the interactive process, the Court noted that "[t]he Third Circuit recognized that employers can show their good faith attempt to find a reasonable accommodation in many ways, such as meeting with the employee who requests accommodation, requesting information about the condition and what limitations the employee has, asking the employee what he or she specifically wants, showing some sign of having considered the employee's request, and offering and discussing available alternatives when the employee's request is too burdensome." Id. at 953 n. 7, citing Taylor v. Phoenixville School District, supra at 162; see also, Smith v. Midland Brake Inc., 180 F.3d 1154, 1172 (10th Cir. 1999)(discussing, generally, the interactive process requirements of the ADA); Seiberns v. Wal-Mart Stores, Inc., 946 F. Supp. 664, (N.D. Ind. 1996)(holding that the employer's consideration of an accommodation, and of other positions, which the employee might be eligible to obtain, were

sufficient to find that the employer had engaged, in good faith, in the interactive process).

Here, the Defendant undertook most, if not all, of the actions that were addressed in Fjellstad, but the factual circumstances, which are presented here, are starkly distinct from those that confronted the Court there. We have closely reviewed the Affidavit of Jandrt, who performed the accommodations assessment of the Plaintiff, in conjunction with the Record as a whole. Jandrt has averred to the standard policy of the Defendant, in assessing an accommodation for the Plaintiff, and for others, and the Plaintiff has provided no evidence which substantively contradicts those averments. In addition, the Record establishes the following:

> 1. That Jandrt spoke with Molitor, who was knowledgeable about the realities of the work environment in Duluth, so as to garner a full understanding of the actual work requirements of a CSA, at the Duluth airport;
>
> 2. That Jandrt personally reviewed all of the Plaintiff's medical records;
>
> 3. That an independent medical examination of the Plaintiff was ordered, and that Jandrt did not commence her accommodations assessment until she had received a final report from Dr. Zanick who, by that time, had both examined the Plaintiff, and had reviewed Dr. Langager's records;
>
> 4. That Jandrt conducted a telephonic conference between herself, the Plaintiff, his union representative, and Molitor, during which, each of the four positions, in which a CSA is

> required to work, were discussed, along with the possibilities for accommodations in each of those positions;
>
> 5. That, following her assessment, Jandrt determined that no accommodation could be made for the Plaintiff, and that Molitor concurred in that decision; and
>
> 6. That the Plaintiff was provided with the opportunity to explore transferring to another location, where he could be accommodated, or could work without an accommodation, but he declined to do so.

See, Jandrt Affidavit.

We reiterate that these factual attestations have not been meaningfully controverted.

We are mindful that the Plaintiff has little regard for the Defendant's assessment of the essential functions of the CSA position, but "much of the information which determines [] essential functions lies uniquely with the employer." Benson v. Northwest Airlines, Inc., supra at 1113. Moreover, under the law of this Circuit, "[a]n employer's judgment on [the fundamental job duties of the employment position] is highly probative." Alexander v. Northland Inn, supra at *3, citing Moritz v. Frontier Airlines, supra at 787, and 29 C.F.R. §1630.2(n)(3). While the Plaintiff quarrels with the conclusions that the Defendant reached on the accommodations question, he has identified no fatal flaws in the interactive accommodations process that the Defendant employed.

In view of the evidence presented, we conclude that no reasonable Jury could find that the Defendant failed to make a good faith effort to engage in the interactive process in determining whether a reasonable accommodation existed to allow the Plaintiff's return to work. In contrast, the Plaintiff offers only unsupported accusations that the Defendant employed bad faith, not because it impermissibly departed from the requirements of the ADA, either as imposed by the Act itself, or by the Courts that have construed the reasonable accommodation provisions, but because the Defendant did not accede to each of the Plaintiff's procedural requests. Moreover, the Record strongly suggests that the Plaintiff did not want accommodation. While some of that evidence is contested, his rejection of a reassignment option is not. Within this Circuit, "reassignment is an accommodation of last resort." Cravens v. Blue Cross and Blue Shield of Kansas City, supra at 1019, citing Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1301 (D.C. Cir. 1998)[en banc]("Congress saw assignment, as the EEOC does, as an option to be considered only after other efforts at accommodation have failed."). Plainly, the Plaintiff preferred receiving his total disability benefits to being reassigned to another available position.[7]

[7]Notably, the Plaintiff has not attempted, with competent evi-
(continued...)

While the Plaintiff would have us conclude that, isolated by himself, he could not fend off the Defendant's alleged bad faith, we note that he was accompanied by his union representative, during the accommodation assessment conference, and the Plaintiff identifies nothing in Federal labor law, or in the ADA, which requires the participation of his attorney, or his physician, in the prescribed interactive process. Accordingly, we conclude that the Plaintiff has failed to state a viable claim against the Defendant, with respect to the CSA position, and therefore, we grant the Defendant's Motion for Summary Judgment on that claim.[8]

c. The Plaintiff's Claims Regarding the CSS Application.

Lastly, the Plaintiff claims that the Defendant violated the ADA with respect to his application for the CSS position.

---

[7](...continued) dence "to reconcile the seemingly contradictory statements," which supported his application for a total disability, with his current effort to suggest that he was physically able to perform the essential functions of the CSA position. See, Gilmore v. AT & T, --- F.3d ---, 2003 WL 367370 at *4 (8th Cir., February 21, 2003), quoting Lane v. BFI Waste Sys. of North America, 257 F.3d 766, 769-70 (8th Cir. 2001).

[8]Having so concluded, we do not further address the fourth element of a failure to make a reasonable accommodation claim, which requires a determination as to whether, absent an employer's bad faith failure to enter into the interactive process with the employee, the disabled employee would have been accommodated, other than as we have already determined that Jandrt's conclusion, as to the nonexistence of a reasonable accommodation was compliant with the ADA.

According to the Plaintiff, based on the August Memorandum, Dr. Langager refused to prescribe a return-to-work date for him, because he did not believe that the Plaintiff could return to work without any restrictions and, without a return-to-work date, the Plaintiff was told that he could not take the retest for that position. As a consequence, the Plaintiff contends that the August Memorandum precluded him from completing his application for the CSS position which, he maintains, is a violation of the ADA.

As we have previously explained, to state a claim under the ADA, the Plaintiff must show that he was disabled, that he was qualified to perform the essential functions of the job, either with or without accommodation, and that he suffered adverse employment actions because of the disability. See, Gilmore v. AT & T, --- F.3d ---, 2003 WL 36370 at *4 (8th Cir., February 21, 2003), citing Land v. Washington County, Minnesota, 243 F.3d 1093, 1095 (8th Cir. 2001). Again, the Defendant does not contest that the Plaintiff was disabled, but it asserts that, as to the CSS position, the Plaintiff is unable to satisfy both the second and third elements of his claim.

As to the second element -- that is, the Plaintiff's ability to perform the essential functions of the CSS position -- the Plaintiff argues, based on his experience at the Duluth location, that he could have performed the functions of that position without

accommodation, and alternatively, he contends that he could have done so with accommodation. While he maintains that he was qualified, the Defendant disagrees, and relates that, under the ADA, in order to be "qualified" an employee must meet two requirements: first, the employee "must 'satisfy the requisite skill, experience, education and other job-related requirements' of the position," and second, he must be able, with or without accommodation, to perform the essential functions of the job. See, Gilmore v. AT & T, supra at *4, citing Cravens v. Blue Cross and Blue Shield of Kansas City, supra at 1016, citing in turn, Benson v. Northwest Airlines, Inc., supra at 1111-12; see also, 29 C.F.R. §1630.2(m).

According to the Defendant, the Plaintiff cannot establish either element, since he failed the first when he did not pass the Basic Skills Examination, and he failed the second because, contrary to the Plaintiff's view, the CSS position required the same abilities as did the CSA position, such that the conclusion reached by Jandrt, that the Plaintiff could not be accommodated at the CSA position, would have equal application to the CSA position.

We are persuaded that the Plaintiff was not qualified for the CSS position, because he did not pass the required testing. The Plaintiff argues that he should be excused from that requirement because the August Memorandum precluded him from having the return-to-work date, which was required of him in order to sit for the re-

test. In addressing that issue, we start by noting that we do find sufficient evidence in the Record to support the conclusion that Dr. Langager believed that he could not release the Plaintiff to work unless the Plaintiff was without restriction, and that the Plaintiff was told, by Molitor and his union representative, that he could not take the retest for the CSS position, until he had a return-to-work date. However, we cannot agree, even taking those facts as granted, that a viable claim has been asserted under the ADA.

The Plaintiff's inability to retest was not caused by any statement from either Molitor, or the Plaintiff's representative, but rather, it was the result of his not having a return-to-work date. The Plaintiff maintains that his lack of a return-to-work date was due to the August Memorandum, arguing that he did not have a return-to-work date "because he still had restrictions," and that, "similar to [his] situation with the CSA position, a retaking of the test was futile." <u>Plaintiff's Reply Memorandum</u>, at 2. He also argues that, because of the "one hundred percent healed" policy, which was assertedly embodied in the August Memorandum, he "was just as excluded from the CSS retest as he was from returning to his CSA postion," because he "believed any efforts directed toward either a return to the CSA position or testing for the CSS position would be a futile gesture." <u>Id.</u>

We have already detailed, however, why the Plaintiff may not rely on the August Memorandum in order to support a futility argument. The Plaintiff contends that it would have been futile for him to attempt to get a return to work date, because Dr. Langager would not have given him one, as he could not return to work without restrictions. However, the Defendant had no such policy, and the Plaintiff's subjective belief as to the import of the August Memorandum is insufficient to excuse him from taking the actions, that he needed to take, in order to be permitted to apply for the CSS position. Thus, we conclude that, even if the Plaintiff could show that he was otherwise qualified for the CSS position, his failure to retest, when the retest was scheduled for him, was not excused by the futile gesture doctrine. Accordingly, the Plaintiff has failed to satisfy the second element which is essential to his ADA claim.

Likewise, with respect to the third element of his claim, the Defendant maintains that the Plaintiff did not suffer an adverse employment action as to the CSS position because of his disability, but rather, it was simply because he had not passed the required skills test. We agree. Having found that the Plaintiff's failure to retest was not excused by the futile gesture doctrine, and was not the result of any action taken by the Defendant, but rather, was the product of his mistaken, subjective interpretation of the

August Memorandum, we conclude that the Plaintiff has also failed to carry his burden, at this Summary Judgment stage, as to the third element of his CSS claim. See, Collins v. Raytheon Aircraft Co., 2003 WL 192553 at *6 (D. Kan., January 16, 2003)(rejecting futile gesture doctrine where plaintiff offered "only his subjective belief that he would have been rejected had he applied for other positions."); Burke v. Iowa Methodist Medical Ctr., 2001 WL 739595 at *6 n. 9 (S.D. Iowa, February 22, 2001), aff'd, 28 Fed. Appx. 604, 2002 WL 181241 (8th Cir., 2002). Accordingly, we grant the Defendant's Motion for Summary Judgment on this claim as well.

NOW, THEREFORE, It is --

ORDERED:

1. That the Plaintiff's Motion for Summary Judgment [Docket No. 48] be DENIED.

2. That the Defendants's Motion for Summary Judgment [Docket No. 44] be GRANTED.

3. That the Defendant's Motion to Strike Plaintiff's Reply Papers [Docket No. 40] is DENIED.

4. That the Clerk of Court is directed to enter Judgment in favor of the Defendant.

BY THE COURT:

Raymond L. Erickson
UNITED STATES MAGISTRATE JUDGE